IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**MAYRA ISABEL PAGAN-AQUINO**,
    Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY**,
    Defendant.

Civil No. 23-1087 (BJM)

## OPINION & ORDER

Mayra Isabel Pagan-Aquino ("Pagan") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that she is not entitled to benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Pagan contends the administrative law judge ("ALJ") failed to consider Pagan's absenteeism and pain in the residual functional capacity ("RFC"), failed to properly address the side effects of her prescribed medication, and erred in giving little weight to the treating physician's opinion. Docket No. ("Dkt.") 16. The Commissioner opposed. Dkt. 22. This case is before me by consent of the parties. Dkts. 5, 7. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## APPLICABLE LEGAL STANDARDS

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health &*

*Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the

Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1 (the "Listings"), which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the Fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings.

On June 30, 2015, Pagan filed an application for disability insurance benefits. Tr. 292-300. She originally alleged her disability onset date was May 5, 2010 but then amended her disability onset date to January 1, 2012. Tr. 292, 326. Pagan was born in 1962. Tr. 180. She obtained a high school degree and did two years of college (Tr. 338, 819), and previously worked as a teacher's aid, security guard and business owner of pet shop. Tr. 79-84. Her date last insured was September 30, 2013. Tr. 768. The Commissioner denied Pagan's application for benefits initially, on reconsideration, and after a hearing before an ALJ. Tr. 179-90, 191-205, 790-831. The record before the Commissioner, which included medical evidence and Pagan's self-reports, is summarized below.

*Treating Physicians*

**Hospital Metropolitano Dr. Tito Mattei**

On July 22, 2011, Pagan had a stomach biopsy. The biopsy results reflected Pagan had severe chronic gastritis with moderate activity. Tr. 528-29. She was also positive for a severe helicobacter pylori infection. Tr. 529.

**Dr. William Silva Cherena**

Progress notes range from June 5, 2003 through August 31, 2015. Tr. 114-56. Notes are largely illegible or outside the relevant period.

On September 1, 2015, Dr. Silva filled out a General Medical Report. Tr. 1154. There, Dr. Silva informed that he had been treating Pagan since June 2003. He last examined Pagan on June 8, 2015. On that day, Dr. Silva indicated that Pagan had constant neck and low back pain, polyarthralgia and chest and hip pain. *Id.* He found Pagan had dizzy spells daily. He found upon examination that Pagan presented with a diminished sensory system. Tr. 1155. Dr. Silva also stated

she had decreased range of motion of the cervical and lumbar spine, shoulders and hips. Tr. 1156. He noted Pagan had normal gait and station. Tr. 1155. Dr. Silva diagnosed Pagan with osteoarthritis, sacroiliitis, gastroesophageal reflux disease, carpal tunnel syndrome, cervicalgia, lumbago, peripherovascular disease, and shoulder tendinitis. Tr. 1156. As to her mental condition, Dr. Silva noted Pagan's recent memory was impaired. She had poor judgment but dressed adequately. *Id.* Dr. Silva-Cherena assessed a very poor prognosis. *Id.* He stated Pagan could not work at her usual job of a teacher and that her mental state was an impairment for any job. *Id.*

**Pathlab**

On January 17, 2012, Pagan had a Thyroid ultrasound. Tr. 1104. It revealed that she had two thyroid nodules on her right side and another on her left. They performed a fine needle aspiration of the three nodules, and they were diagnosed as benign follicular nodule. *Id.*

**CIRT**

On June 20, 2012, Pagan had a CT scan of the abdomen and pelvis. CT scan showed sigmoid diverticulosis and no evidence of diverticulitis. Tr. 476.

On August 13, 2013, Pagan had another CT of the abdomen and pelvis. CT scan showed diffuse fatty infiltration of the liver, and diffuse colonic diverticulosis. Tr. 673.

**Hospital Metropolitano Titto Mattei**

Pagan was hospitalized for gallbladder surgery from January 20 to February 3, 2011. Tr. 491-526. She came in with abdominal pain. She was diagnosed with acute cholecystitis or cholelithiasis and was scheduled for surgery. Tr. 495. In surgery, doctors found a gallbladder with inflammation, erythematous and multiple gallstones. Tr. 514.

Pagan was again hospitalized for diverticulitis surgery on July 22, 2011. Tr. 527-531. A stomach biopsy revealed chronic gastritis with moderate activity and a severe infection of helicobacter pylori-like organisms. Tr. 529.

On April 29, 2013, Pagan went on foot to the emergency room with left lower abdominal pain, fever and headache. Tr. 130, 646. Her pain was acute, sharp and fixed. Tr. 130. She claimed nothing made the pain better, but also did not take anything for the pain. *Id.* She presented with diarrhea, dizziness and nausea. *Id.* She was admitted to the hospital and released on May 2, 2013. She was diagnosed with acute diverticulitis and thyroid disease. Tr. 649. She was given pain medication and her pain level lowered to two out of ten. Tr. 650. On April 29th, she received a CT scan of the abdomen and pelvis. It showed Pagan had sigmoid colon acute diverticulitis. Tr. 664.

On May 1st, Pagan had a thyroid sonogram. It revealed slightly low heterogenous parenchymal echotexture. Tr. 663. She was treated with antibiotics, Pepcid and only given pain medication on April 29th. Tr. 669-70.

**Dr. Roberto Maiz**

Dr. Maiz gave Pagan a double contrast barium enema on August 8, 2013. He did a fluoroscopic and radiographic examination of the colon. Tr. 672. The procedure showed severe diverticular disease of the colon. *Id.*

**Hospital de la Concepcion**

Pagan was hospitalized for acute and recurrent diverticulitis from October 9 to October 11, 2013. Tr. 532-34. Her abdomen was distended, soft and depressible. Her abdomen was diffusely tender, pain was located predominately on the left lower quadrant and supra pubic area. Tr. 537. She was discharged with instructions to have a low sodium and low-fat diet. Tr. 534. She presented with no pain, no fever and no bleeding upon being discharged. Tr. 543.

Pagan was again hospitalized from December 10 through December 14, 2013. She was diagnosed with sigmoid diverticulosis and had a laparoscopic partial colectomy. Tr. 563.

**Hospital de la Concepcion – Centro de Imagenes**

On October 24, 2014, Pagan had a bone scan. Findings were suggestive of inflammatory and/or degenerative changes throughout the spine, shoulders, knees, feet, both sacroiliac joints, right sternoclavicular joint and acetabulum. There were also inflammatory changes and/or arthritis in several joints of both hands. Finally, there was evidence of fibrocystic disease. Tr. 434.

On November 6, 2014, Pagan had an MRI of the cervical spine. Tr. 1162. It showed degenerative spondylosis, disc desiccation and multiple bulges. On the same day, she also had an MRI of the lumbar spine. There, the radiologist also found degenerative changes and bulges. Tr. 1163.

**Dr. Jorge L. Baez Torres**

On December 11, 2014, Dr. Baez performed an electromyographic examination and nerve conduction velocity study. Tr. 1160. Dr. Baez found Pagan had bilateral carpal tunnel syndrome. Tr. 1161. The nerve conduction test showed bilateral median mild to moderate motor distal latencies delayed across the carpal tunnel. Dr. Baez recommended using hand splints at night. Tr. 1161.

**Medical X-Ray Center**

On August 3, 2015, Pagan got an x-ray of her bilateral sacroiliac joints. Tr. 1157. It showed sclerosis and narrowness of the right sacroiliac joint. There was also a mild sclerosis and narrowness on the left side. The x-ray showed that, on the left side of her joint hip, Pagan had soft tissue calcification. She was diagnosed with bilateral sacroiliitis.

On the same day, Pagan also got an x-ray of both shoulders. She was diagnosed with bilateral osteoarthritis of the acromioclavicular joint and tendonitis calcarea of the left shoulder. Tr. 1158. Additionally, her hips were x-rayed. The radiologist found that she had bilateral osteoarthritic changes of the hip joints and bilateral sacroiliitis.

***Procedural History***

In a disability report dated July 9, 2015, Pagan claimed the following conditions: fibromyalgia, degenerative arthritis, depression, cholecystectomy, diverticular disease, carpal tunnel syndrome, and bulging disc at L3 to L4, L5 to S1, C3 to C4, C6 to C7, C7 to T1 She also claimed degenerative spondylosis, disc desiccation, plantar calcaneal spur and hammered toe deformity. Tr. 337. She claimed to be taking Elavil for depression, Flexeril as a muscle relaxant, Klonopin for depression, Neurontin and Norflex for pain, Wellbutrin for depression and Xanaflex as a muscle relaxant. Tr. 340.

In a function report dated August 12, 2015, Pagan stated her conditions limited her because she could not stand or sit for too long. Tr. 86. She could not bend, lower herself or kneel. She felt strong pain in her entire body. As a result, she could not carry or lift things. She also claimed to have an emotional condition that affected her. She would get nervous and have crying spells. She claimed to have depression, anxiety, loss of memory and concentration. *Id.*

Her daily routine was mostly at home. Tr. 87. Her children help her do the housework and if they are not available, the housework did not get done. She claimed to have insomnia because the pain in her body was so strong that it would not let her sleep. She would spend all night changing positions. She could not take care of her personal needs, such as brushing her hair and dressing herself because she cannot lift her arms. She also had trouble bathing herself because she cannot bend over. Some days she did not have a desire to eat. *Id.* She needed reminders to take

care of her personal needs and to take her medicines. Tr. 88. She prepared simple meals such as sandwiches, which take her about thirty minutes to prepare. Prior to her conditions, she was able to cook everyday and clean the dishes. *Id.* She tried to do housework but never finished because she cannot stand or sit for too long, she cannot carry things and she was not motivated. Tr. 88-89. When she went out, she rode as a passenger in a vehicle. She did not go out alone.

She was able to pay her bills, count change and use a checkbook or money orders; however, she could not manage a savings account. Tr. 89. She watched TV depending on how she felt. Tr. 90. She could walk two blocks before needing to stop and rest. Tr. 91. She could not pay attention for very long. *Id.* She could not follow spoken or written instructions. She got along well with authority figures. Tr. 92. She could not manage stress and has crying spells. She also could not manage changes in her routines because it made her angry, stressed and anxious. She used a back brace, a knee brace and eyeglasses all the time. *Id.* She took Neurotin and Klonopin. She claimed these medications gave her headaches, dizziness and drowsiness. *Id.*

On September 16, 2015, Dr. Ulises Melendez, a Disability Determination Service non-examining physician, stated that although there is evidence of a spine disorder prior to the date last insured, there was no evidence of a complete physical examination in order to assess the severity and that, therefore, the medical evidence was insufficient at the date of last insured. Tr. 187-188.

In another disability report dated November 12, 2015, Pagan claimed a change in her conditions. She stated she had severe and constant pain in her whole body that limited her ability to walk, stand, sit, bend or kneel due to fibromyalgia, arthritis, bulging discs, plantar calcaneal spur and hammered toe deformity. Pagan claimed she could not lift, hold or carry objects. She also claimed to have carpal tunnel syndrome, diverticular disease, insomnia, depression, anxiety, crying spells, and memory loss. Tr. 366. She also claimed a change in her daily activities. Tr. 372. Pagan

stated that she was homebound; there were days she could not get out of bed. She had to constantly change positions to alleviate pain. She also had limitations to shower and dress; she can dress slowly. Pagan did not like to go out and interact with other people.

On December 10, 2015, Dr. Jose Gonzalez-Mendez reconsidered the non-disabled determination. Dr. Gonzalez stated Pagan could occasionally lift/carry and push/pull 20 pounds and 10 pounds frequently and sit, stand and walk about six hours in an eight-hour workday. He also opined that the claimant could occasionally climb ladders, ropes and scaffolds and crawl and could frequently stoop, kneel and crouch. Tr. 201-02.

In a third disability report dated January 22, 2016, Pagan again claimed her conditions had changed. She claimed her fibromyalgia and arthritis caused her severe and constant pain in her whole body that limited her ability to walk, stand, sit, bend and kneel. Tr. 378. She claimed there were days that she could not do anything and needed to alternate positions constantly to alleviate the pain. She also stated her bilateral carpal tunnel limited her ability to lift, hold, grab, and carry objects. Her emotional conditions caused her insomnia, depression, anxiety, crying spells, change of humor and memory and concentration loss. Tr. 378. She also claimed a change in her daily activities. Tr. 372. Pagan stated that she was homebound; there were days she could not get out of bed. She also had limitations to shower and dress; she can dress and shower slowly. Pagan did not like to go out and interact with other people. Tr. 383.

Pagan's claim was initially denied on September 22, 2015, with a finding there was insufficient evidence to evaluate the claim. Tr. 189. Pagan requested reconsideration, submitted additional evidence and claimed she was unable to sustain gainful work activity. Tr. 212. Pagan's claim was denied on reconsideration on December 10, 2015, affirming the initial determination. Tr. 191-205. There was a hearing held via telephone on August 29, 2017, before ALJ Juan Carlos

Hunt. Tr. 239-44; 34-62. The ALJ found Pagan not disabled. Tr. 12-33. Pagan requested review of the ALJ's decision to the Appeals Council, which denied review. Tr. 289, 1-7. Subsequently, Pagan appealed to the U.S. District Court and the court remanded the case back to the Commissioner. Tr. 905-07. The Appeals Council ordered a new ALJ hearing. Tr. 897-904.

A hearing was held via telephone on August 20, 2021, before ALJ Victoria A. Ferrer. Tr. 790-831. Pagan did not claim new conditions or changes in her existing ones.

Pagan testified that she had gallbladder surgery in 2011. She also had surgery in her intestines in 2013 due to her diverticula and diverticulitis. Tr. 806-07. Pagan stated she had been hospitalized three times and that she was out of work for three months due to the surgery. She testified that when she returned to work in 2014, her conditions were more severe, and she was not able to perform the duties of her job. Pagan stated that she was fired because of this. *Id.*

Pagan indicated that she had osteoarthritis, psoriatic arthritis, muscle spasm, joints pain, herniated discs, shoulders tendinitis, carpal tunnel syndrome, lumbar spine disc disease, feet spurs, migraine, frequent dizzy spells, and loss of strength. Tr. 809-10. She also indicated that she could not lift her arms and has chest pain, gastritis, diverticulosis, diverticulitis, difficulty sleeping due to the pain, anxiety, depression, and generalized weakness. Pagan added she could not grab or lift any objects, that her hands and legs are swollen, has skin sores causing itching, a cardiac condition, and breasts cysts. She could not sit, stand or walk for long periods. Tr. 810. She also could not concentrate. She indicated that she had been taking Prozac since 2011, which was prescribed by her cardiologist. Tr. 810-11. Pagan stated Prozac caused her a lot of headaches and migraines, so the doctor had to switch to another medication. Tr. 814.

Pagan testified her pain continued to worsen. Tr. 815. She testified her medications compromised her immune system. She also stated Humira, another medication, caused tumors in her body. Tr. 815.

Pagan also testified that she was hospitalized four times in 2012 and spent an average of eight days in the hospital each time. In addition to those hospitalizations, she visited the doctor three or four times a month. Tr. 816. Pagan also stated she was hospitalized three times in 2013 and spent on average five days at the hospital each time. She also would go to the doctor three or four times a week. Tr. 818-19.

Vocational expert ("VE") Maria de Leon testified that Pagan's teacher's aid job was a Specific Vocational Preparation ("SVP") of six. Tr. 821. The ALJ asked the VE if a person with the following limitations could perform Pagan's past work: she can lift or carry twenty pounds occasionally and ten pounds frequently, can stand and walk approximately six hours in an eight-hour day and sit for approximately six hours in an eight-hour day, can push and pull as much as she can lift and carry, can occasionally climb ladders, ropes or scaffolds, can frequently stoop, kneel, crouch and occasionally crawl, and can frequently handle, finger and feel. The VE answered that such a person could perform Pagan's job as a teacher's aid. Tr. 822

The ALJ next inquired if a person with the same age, education (at least high school education and part university education), and vocational experience as Pagan could do any other job in the nation on a sustained basis. The VE answered that such a person could perform other work in the national economy, such as marker, checker I, and router, all SVP of two. Tr. 822-23. The ALJ asked if a person who reached fifty years of age with the same vocational factors and limitations could perform the jobs listed. The VE answered that such a person could perform any of the listed jobs. Tr. 823.

Pagan's counsel asked the VE whether a person with the same limitations the ALJ presented, but must be absent or off-task more than 10% of the workday, could perform the jobs of marker, checker I, and router. The VE stated she could not perform those jobs. Tr. 823-24.

Pagan's counsel also asked the VE whether a person with the same limitations the ALJ presented but must be absent three or four times a month for medical appointments or because she gets sick, could perform the jobs of marker, checker I, and router. The VE stated she could not perform those jobs. Tr. 825.

Pagan's counsel asked the VE about a third scenario: whether a person with the same limitations the ALJ presented but, due to her conditions, unexpectedly misses approximately thirty-two days of work a year, could perform the jobs of marker, checker I, and router. The VE stated she could not perform those jobs or any other job in the national economy. Tr. 825.

Subsequent to the hearing, the ALJ sent a Medical Assessment of Ability to do Work-Related Activities to Dr. Gilberto Muñoz. Tr. 1231. Dr. Munoz found Pagan could lift and carry up to ten pounds frequently and up to twenty pounds occasionally. Tr. 1248. Pagan could at one time sit four hours without interruption, stand for two hours without interruption, and walk for one hour without interruption. In an eight-hour work week, she could sit for six hours, stand for three hours and walk for three hours. Tr. 1249. She could continuously use both hands for reaching, handling, fingering, feeling, pushing and pulling. Tr. 1250. Pagan could also frequently climb stairs and ramps, balance, stoop, kneel, crouch and crawl. Tr. 1251. She could never climb ladders or scaffolds. *Id.* She could go shopping, travel without a companion, walk a block at a reasonable pace on rough or uneven surfaces, and use standard public transportation. Tr. 1253. She could also climb a few steps at a reasonable pace, prepare simple meals and feed herself, and care for personal hygiene. Finally, she could sort, handle and use paper or files. Tr. 1253. Dr. Muñoz considered

Listing 5.00 and indicated there is no listing for diverticulosis/diverticulitis. He also indicated Pagan had episodes of diverticulitis, but that her symptoms did not have the severity for any of the gastrointestinal listings. Dr. Muñoz added Pagan also has diffuse fatty infiltration of the liver, but that there was no evidence of cirrhosis. Tr. 1256.

On December 22, 2021, the ALJ found that Pagan was not disabled under sections 216(i) and 223(d) of the Act. Tr. 759-84. After determining Pagan was last insured on September 30, 2013, the ALJ made the following findings at Steps One through Five:

(1) Pagan had not engaged in substantial gainful activity during the period of her alleged on-set.

(2) She had the following severe impairments: osteoarthritis, carpal tunnel syndrome, bilateral shoulder tendinitis, esophageal hiatal hernia, bilateral hallux valgus, hammered toe deformities bilaterally, and small plantar calcaneal spur, chronic gastritis with moderate activity, positive Helicobacter pylori infection, status post cholecystectomy and hysterectomy, mild hydronephrosis and acute diverticulitis. (20 CFR 404.1520(c))

(3) She had the following severe impairments: diverticular disease of the colon and cervical and lumbar degenerative disc disease. (20 CFR 404.1520(c)). However, Pagan did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(4) She retained the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) but with non-exertional limitations that reduced her capacity for work. She could occasionally crawl, climb ladders and scaffolds. She could frequently stoop, kneel, and crouch. She could also frequently handle, finger, and feel. Therefore, she could perform past relevant work.

(5) Additionally, as per her age, education, work experience, and RFC, Pagan could also perform jobs that existed in significant numbers in the national economy.

The Appeals Council denied review, Tr. 751, and this action followed.

## DISCUSSION

Pagan argues the ALJ failed to consider Pagan's absenteeism and pain in the RFC, failed to properly address the side effects of her medications and erred in giving little weight to her treating physician's, Dr. Silva's, opinion. Dkt 16 at 5, 13. I discuss each argument in turn.

### I.    Pagan's Hospitalizations

Pagan argues the ALJ failed to take into consideration in her RFC the potential effects of Pagan's absenteeism and off task behavior. Dkt. 16 at 6. The Commissioner contends Pagan does not point to any record evidence that demonstrates she would be off task 10% of the time or absent from work more than once per month. Dkt. 22 at 5.

An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* A claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982).

Pagan testified she was hospitalized four times in 2012 for diverticulitis and body swelling. She stated she was hospitalized on average for eight days during each hospitalization. She also stated that she visited different doctors three or four times a month. The record does not support

these assertions. For the year 2012, the record only shows that Pagan had a CT scan which diagnosed her acute diverticulitis (Tr. 475) and one visit to Dr. Silva. Tr. 412.

Pagan also testified she was hospitalized three times in 2013 and that she would visit her doctor three or four days per week. Tr. 818-19. The record confirms that Pagan was hospitalized three times during 2013. Tr. 532-85, 649-71. Two of the hospitalizations occurred after the date of last insured. Additionally, the record only shows she went to see Dr. Silva two times in 2013: March 14 and June 1. Tr. 412-414. However, it should be noted that the ALJ took the hospitalizations after the date of last insured under consideration when evaluating the RFC. Tr. 772-73. The ALJ stated, "during the period at issue . . . the claimant had bouts of diverticulitis, but these resolved with treatment." Tr. 774. As such, Pagan's challenge to the ALJ's omission of off-task limitations amounts to an unavailing invitation to the court to reweigh the expert opinion evidence. *See, e.g.*, *Rodriguez v. Sec'y of Health & Hum. Servs.*, 647 F.2d 218, 222 (1st Cir. 1981) ("[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts.").

**II.     Pain**

Pagan also argues the ALJ "omitted or did not give credibility to [her] testimony of the constant pain." Dkt. 16 at 13. Specifically, Pagan argues a bone scan from 2014 confirmed the years of pain she endured. *Id.* The Commissioner states "the ALJ expressly considered [her testimony], [the ALJ] simply found that it did not support the claimant's symptoms and functional limitations to the extent alleged." Dkt. 22 at 13. The Commissioner is correct.

The ALJ did not omit or fail to give credibility to Pagan's testimony. On the contrary, the ALJ expressly considered Pagan's self-reported symptoms, including that she suffered from pain. Tr. 774 ("[Pagan's] medically determinable impairments could reasonably be expected to cause

symptoms prior to the date last insured; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."). Nonetheless, the ALJ accurately explained that there were no medical records for emergency room visits for neck and back pain or any form of aggressive treatment for it. Tr. 774; *see Irlanda Ortiz v. Secretary of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir.1991) (gaps in medical record may be treated as evidence); also *see* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability… there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment…"). After considering Pagan's self-reports and the medical evidence of record, the ALJ found that Pagan's "subjective complaints and alleged functional limitation are not fully persuasive and that she retained the capacity to engage in light exertion with the limitations set [in the RFC]." Tr. 776. This finding is supported by substantial evidence.

### III. Medication Side Effects

Pagan next argues the ALJ disregarded Pagan's testimony that her medication made her feel drowsy and weak. Dkt. 16 at 12. The Commissioner contends the ALJ properly considered this testimony but "found that medical evidence did not support her symptoms and functional limitations to the extent alleged.". Dkt. 22 at 7 (citing Tr. 772). The record does not show that Pagan complained of any side effects to her physicians. And Pagan points to no evidence beyond her testimony that she did. "The ALJ is not required to take the claimant's assertions of pain at face value." *Baez v. Comm'r of Soc. Sec.*, 2022 WL 17729299, at *7 (D.P.R. Dec. 16, 2022) (citing *Bianchi v. Sec'y of Health & Hum. Servs.*, 764 F.2d 44, 45 (1st Cir. 1985)). There must be objective medical evidence from an acceptable medical source to find that a claimant is disabled. 20 C.F.R.

§ 404.1529(a). Because none exists, even if the ALJ erroneously failed to explain why she discounted Pagan's testimony regarding her medication side effects, such an error would be harmless and thus not warrant remand.

### IV. Treating Physician

Finally, Pagan argues the ALJ erred in giving little weight to the medical opinion of Dr. Silva. Dkt. 16 at 12. "[T]he law in this circuit does not require the ALJ to give greater weight to the opinions of treating physicians." *Arroyo v. Sec'y of Health & Hum. Servs.*, 932 F.2d 82, 89 (1st Cir. 1991). However, "'controlling weight' is typically given to a treating physician's opinion on the nature and severity of an impairment where it 'is well-supported by medically acceptable and laboratory diagnostic techniques and is no inconsistent with the other substantial evidence' in the claimant's case." *Arruda v. Barnhart*, 314 F.Supp.2d 52, 72 (D. Mass. 2004) (citing 20 C.F.R §§ 404.1527(d)(2) & 416.927(d)(2)). Furthermore, an ALJ can downplay the weight of a treating physician's assessment of the nature and severity of an impairment when it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and non-examining physicians. 20 C.F.R §§ 404.1527(d)(2)-(4) & 416.927(d)(2)-(4).

Here, the ALJ gave little weight to the opinion of Dr. Silva "indicating that the claimant could not perform her job as a teacher or in her part business," and "indicating that the claimant's mental state was an impairment for any job." Tr. 774. The ALJ did not err in giving such little weight because the determination of whether a person is disabled is reserved for the Commissioner. *See* 20 C.F.R. § 404.1527 ("A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled."). Additionally, the ALJ explained why it was giving little weight to Dr. Silva's opinion about Pagan's mental state. The

ALJ stated, "although [Dr. Silva] stated in his opinion that one of the diagnosis of the claimant was 'chronic major depression,' there is no indication in the record that this impairment existed and/or existed at any severe level prior to the date of the last insured." There is no evidence on the record of Pagan's mental state during the relevant period. The ALJ did not err in giving little weight to these statements.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 27th day of March 2024.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge